Good morning, and may it please the Board. My name is Rayburn Lominack, and I represent the Employer Intertape Polymer Corp., also known as IPG. IPG operates a small tape manufacturing plant in Columbia, South Carolina, where this case arose. We are here today because the Board deviated from its longstanding precedent governing employer conduct during a union organizing campaign. The Board's deviation led it to overturn an election in which employees voted substantially against being represented by the United Steelworkers Union in April 2012. The first issue presented for review involves the panel majority's finding that IPG's managers engaged in unlawful surveillance or spying when they passed out thank you flyers at the same time union supporters were passing out campaign material. This issue calls on the Court to examine the intersection between Section 7 rights and Section 8C rights, which is something the panel majority failed to do in this case. Section 7 gives employees the right to join and support a union. Section 8C gives employers the right to engage in free speech during an organizing campaign. 8C was incorporated into the Act in 1947 by the Taft-Hartley Amendment. Prior to that time, employers were required to remain neutral during an organizing campaign. But Section 8C codified the First Amendment rights that employers have, and the U.S. Supreme Court has since held that Section 8C and Section 7 rights are equal. The contents of the flyer that the IPG managers were distributing at the plant gates on April 24th and 25th was undisputedly protected by Section 8C, as was their conduct in passing out the flyers when no union supporters were there. There's also no allegation or implication or attenuation. As I understand it, there were two different dates when the flyers were passed, maybe more, but one was April 24th and 25th? Yes, Your Honor. And one of those dates the supervisors were passing out literature, and I understand union adherents were not there. Correct. But in the following date, they were both there at the same time. Well, Your Honor, on April 24th, there was a morning session where the plant supervisors were passing out literature, and no one was there. On April 24th, 25th in the morning session, no one was there. On the evening of April 24th, the plant supervisors were passing out flyers first, and then, undisputedly, the union supporters came out after that and started distributing. On April 25th, during the evening session, there's a dispute in the record about who actually arrived first. Does that make a difference? Who's there first? Your Honor, who was there first was ignored by this board panel majority. They found it not relevant. It is absolutely relevant in analyzing the context of what truly was surveillance or unlawful activity. Yes, Your Honor, it was relevant. The board didn't even consider it. The panel majority didn't consider it. But if the union folks were there first, and then the company folks show up, can that be construed as surveillance? Your Honor, it could be construed as surveillance. The key, though, and the crux of our argument is that 8C activity is what causes or should cause the board to consider all of those circumstances. Rather than just that straight application of the out-of-the-ordinary standard. As to the circumstances, you say, well, they were just trying to get their point of view out. But is it possible that they were timing their leafleting in a manner so that they would be able to observe very closely which employees took the union literature and which did not? And I think the board found as a fact that nobody took the union's literature at a time when the supervisors were present and handing out their own. So you can imagine circumstances, can you not, at which the leafleting would simply be a cover or pretext for surveillance and an attempt to either, one, identify union supporters or an attempt to chill employees from taking and reading the union's literature. Absolutely, Your Honor. It's certainly possible, but the record in this case does not support that proposition. So then doesn't it come down to a matter of fact-finding and credibility on the part of the board? It comes down to a matter of the board panel majority not considering anything other than the out-of-the-ordinary conduct. And even in the cases that the board relies on that don't involve Section 8C activity, such as what's going on here, there still has to be something besides that out-of-the-ordinary test. It just gives rise to an inference of unlawful conduct. But most frustrating, Your Honor, to IPG and... But did anybody even take the union literature when the supervisors were distributing? I mean, why couldn't the supervisors have distributed on any one of 15 other days? They could have, Your Honor, but 8C protects their right to do it on April 24th and 25th. That's the heart of the protection that the employer has in this scenario. Whether or not an employee took the flyer or not is irrelevant in determining whether their conduct itself was unlawful surveillance if it's protected by 8C. And the union's witnesses suggested or supposed that maybe some people didn't take it because they were out there, but there was absolutely no evidence to support that. But the panel majority didn't even rest its conclusion on that. The panel majority found simply the mere presence of the employer's managers at the same time as the union representatives passing out flyers was unduly cruel. What you're saying to me is that you're saying that the employer's free speech rights were chilled and the rest, but at the same time, you were removing the literature of the union adherence from the lunchroom, the employee lunchroom. So don't you meet yourself going and coming because you've been suppressing the union speech. The point is made that normally the union's literature would have been allowed to remain in that lunchroom until the end of the working day. And all of a sudden, it's just whisked away from the table right after lunch. So you're trying to pose as a great friend of free speech at the same time you're squelching it. Respectfully, your honor, the free speech that was taking place with respect to the union employees distributing literature in the break room was not at all a part of the board's determination with respect to treating union and non-union materials differently. They didn't address that specific issue because it wasn't supported by the evidence. They found what happened to be an unfair labor practice. What they found was that we implemented, IPG implemented a break room housekeeping cleanup procedure in response to the union activity. But as stated in the brief, that argument or to steal a decision by the labor board specifically holds and specifically said that you cannot find an unlawful promulgation violation that an employer created a rule in response to union activity if the only evidence in the allegation and the complaint is disparate treatment. Whether they, you know, whether they changed their practice or why they decided to remove the union literature when they did, those are factual findings on the part of the board, okay? Whether they moved the literature, removed the literature and when, yes, are factual findings. But before you even get to those factual findings, your honor, which in our briefs we submit those weren't even supported by substantial evidence. But before you get there, it has to be a closely related connection and the board completely ignored its own precedent in going that route. You say it has to be a closely related connection. It's in the middle of an election. It has to be, I'm sorry, it has to be a closely related connection between what's alleged in the complaint. What was alleged in the complaint and argued throughout the case by the general counsel was that we treated union and non-union material differently. But when their witness, the general counsel's sole witness on this topic said, no, they cleaned up everything. Well, but they did treat it differently because when there was only non-union literature around, it was allowed to remain where it was. And then suddenly when the union literature comes along, you're cleaning up immediately after lunch, giving it the shortest exposure time. And what bothers me is that you're doing this at the same time that you're claiming to be some champion of free speech. At the same time, you're doing your best to squelch the speech of the other side. But Your Honor, there's no evidence that the employer was attempting to squelch free speech. The employer was... Well, what did you think you were doing when you removed the literature? Magnifying the effect of a speech? The employer was, according to the evidence, simply cleaning up break room material that was left. And it had done that prior to the campaign. But board cases say that that's not a... When was it cleaning up? Exactly, Your Honor. In terms of a promulgation theory, the question is when. And there was no evidence to support when it happened and why. Motivation is the key. Boards made a factual finding that it occurred right after lunch. Whisk. The material was swept away. If you assume that the closely related doctrine has been met, the board still has to find that based on substantial evidence. And one witness said she never saw them clean up the break rooms prior to the union activity. Maybe the board didn't credit that witness. That's the board's job. To do it or not to do it. Well, the board also, though, in order to be supported by substantial evidence and meet this court standard, has to have that evidence supported by substantial evidence. Yes? Do you also take issue with the NLRB's finding about the unlawfully interrogated union employees? And you, as I understand, you agree, you say they credited the union folks more than they did the company. Obviously, they're entitled to do that. But to overcome that, you can do it by arguing that there's an exceptional circumstance. What is your exceptional circumstance in our disregarding the credibility finding? Well, Your Honor, the exceptional circumstances were that it was not based on detailed testimony and it was vague and inconclusive. However, the interrogation allegation is pre-petition. And respectfully, Your Honor, IPG has asked me to specifically focus on those issues, the surveillance and confiscation issues that directly impacted the election in this case. So because the interrogation allegation occurred prior to the election petition being filed, it doesn't impact the results. If I may just... Go ahead and finish your answer. So that's why, Your Honor, but again, in response to your question, the ALJ is not given carte blanche ability to just credit based on vague testimony and inconsistencies in the record. Thank you for your time, Your Honor. We'll hear from the argument on behalf of the board. May it please the court, my name is Nicole Lancia and I represent the board in this case seeking enforcement of its order finding that the company violated Section 8A1 of the Act by unlawfully interrogating employee things, confiscating union literature from the employee break room in response to the union campaign, and surveilling its employees leafleting activities at the plant gate. Turning to first, the board's finding of surveillance at the plant gate, I want to address a few points that counsel made here today. First, the company's arguments regarding the balancing of Section 7 and Section 8C rights wrongly presumes that their speech, not the content of the flyers, but the way in which they communicated with employees on those two days was already protected by 8C when the board was balancing employees' Section 7 rights to be able to leaflet at the plant gate. But there's no presumption that their leafleting at the plant gate, because it was out of the ordinary, was protected by 8C. If a conduct is out of the ordinary and is not the way that the employer customarily communicates with its employees, it is therefore coercive. And because it is coercive, by statutory definition- So they're limited, the employer's limited in his communication to only the places and manner that he's utilized in the past. No, Your Honor. The out of the ordinary conduct standard simply requires, takes into account that the employer has the opportunity to certainly view and observe openly union activity. But when it does so in a manner that's suggestive of coercion and that it's watching employees believe to be engaged in union activity, that's where the problem of coerciveness occurs and the infringement on employee's Section 7 rights. In this particular case, the union had distributed literature in March and stopped. Then a month later, the employer starts. In the morning of the 24th, they're the first ones they're handing out leaflets. In the morning of the 24th, they're the first ones they're handing out leaflets. In the morning of the 25th, they're the first ones they're handing out leaflets. In the union, in the afternoon of the 25th, is the first one they're handing out leaflets. Does that mean, when the union shows up to hand out its leaflets, the employer has to leave or stop and leave? No, Your Honor. In this case, as Your Honor recognizes, in March, the union first began leafletting at that location, the entrance and exit to the plant gate. And the company knew that that was a union-preferred locale. So on April 24th and 25th, when they leafletted there, as the board points out, it's not a matter of who showed up first. It's a matter of that the company had never even been present at the plant gate before, let alone leafletted its employees at the plant gate. I'm trying to understand the board's position. So if the employees start off leafletting and stop, even for a month, the employer cannot commence leafletting there, even if the employees don't do it themselves at all? If their presence there and their activity there, the leafletting in this case, was out of the ordinary conduct, then by definition, the employer is not going to hand out leaflets during the ordinary course of business anyway. Yes, Your Honor. Obviously, this is an unusual situation. But what I'm saying is if the employees start off leafletting and then stop for a month, or stop, the employer cannot go out and hand out leaflets itself. The supervisors cannot go out and hand out leaflets itself, even though the employees have stopped doing it. Is it because it's out of the ordinary? Is that the position of the board? Well, yes, it's out of the ordinary, their presence there in the first place, and their leafletting there. But their surveillance is surveillance of employees engaging in union activity. You're not answering my question. Can they go out there and hand out leaflets or not? After the employees have done it a month before, they've stopped. A month goes by, nothing's going on. Can the employer go out and hand out leaflets? First one's there, and the employees are not there. Employees are not handing out anything. Can the employer go out? Is there a position of the board? Because it's out of the ordinary, they just can't do it, period. I think hopefully I'm understanding your question correctly. I think that because where the problem arose here is that the employees were there engaging in union activity at the same time. Well, that's right. So are you saying then that the employer has to leave? The employer's out there first, handing out leaflets. Nobody's done it for a month, and the employees show up to hand out leaflets. That the employer has to leave. I think, honestly, there are two related concepts. Out of the ordinary conduct, whether it's out of the order in the first place, helps, I think, to inform the answer as to whether the employer has to leave when the employees show up. If the employees aren't there leafletting or engaging in any union activity at all, then there would be no surveillance just by the employer leafletting there. But if the union employee or union supporters are there leafletting, and the employers there are engaging out of the ordinary conduct, as in this case, that's where the violation and the problem occurs. You still haven't answered my question, but I'm going to try one more time and then I'll give. I apologize. If the employer is there handing out leaflets, employees hadn't been there in a month, and the employees show up at the same show up later to hand out leaflets, does the employer have to stop leafleting and leave because it's out of the ordinary? They're handing out leaflets that are out of the ordinary. Do they have to stop and leave? I think assuming it's out of the ordinary and the employees begin engaging in union activity, if the circumstances are present where there's close positioning to the handlers, you could see who might be taking flyers or not, that would be suggestive of coercion. And based on that, it would probably be smart for the employer to leave at that point so as not to engage in unlawful surveillance while the employees are engaging in union activity. You're not contending that the supervisors could never leaflet in the place where they did? I mean, you're not saying, because the chief judge's question interests me, when can they and when can't they? It seems to me that the essence of these elections is that each side gets to present its case, and I'm not sure that this case leaves any guidance to employers as to when they can and cannot leaflet, which was, I understand, one of the reasons for the chief judge's question. But if you were an employer after this decision, what lesson would you draw from it as to when you can leaflet outside the gate? Because as I say, the whole purpose of an election is to let each side get out its case and to make its case with the employees who will be voting. And so anything that squelches the speech of one side or another troubles me. And what I'm wondering is whether this holding doesn't come close to the edge of saying that the union employees were not leafleting there on a regular basis. There had been no activity between the March date and the April date for a considerable period of time. And even when the April 24th and 25th dates came around, they weren't there at least on a part of the time. They weren't there at the same time. So why don't they each have a chance to sort of give the employees their view of it? Let the employees decide. And the employer did have multiple chances in this case to make its case, and in fact did so. Not just at the captive audience meetings in February, March, and April, but also they regularly communicated their opinions on unionization in the morning communication meetings and in the shift huddles and had consistently done so before April 24th and April 25th. And on those days, a month after the union had consistently leafleted and hand-billed out there, supervisors positioned themselves close at the plant gate where they had never been before, and on the 25th were close enough where they were able to observe which employees took union literature and which employees did not. So addressing the court's concern about both sides having an equal opportunity to communicate their positions on the election, the company certainly had its chance to do so from February to April 24th and 25th and had done so in the morning communications and shift huddles. Unlike, arguably, as we would say here, the union turning to the confiscation violation, employee apps every time that she tried to place union flyers in the break rooms on March 22nd, March 23rd, March 29th, Supervisor Bill Williams would come in right after her breaks and clean up the literature. Granted, it was everything, magazines and union literature alike, but that prevented employees on different shifts from being able to communicate with each other about the union. And as this court knows, communication about the case was, you know, I'm not sure that either side got the fullest opportunity they should have had to communicate their views. I'm very troubled by the removal of the union literature from the luncheon table. I'm a little uneasy about the employer leafleting being unlawfully coercive. One overall question that occurs to me is the final vote in this election was 142 to 97. That's a pretty lopsided vote. And, you know, normally in that kind of thing we'd have a harmless error standard or we'd say no harm, no foul. But the board has a virtual per se test that any unfair labor practice that's found under 8A automatically requires a new election. And the test is set forth in the board's super thrift markets case and the Long's Drug Stores case, where the standard is expressed as the only time that violations are harmless are when, quote, it is virtually impossible to conclude that they could have affected the results of the election. Now, then it goes on to say this depends on the number of violations, the severity, the extent of discrimination, the size of the unit. What I'm wondering here is whether we're allowing some fairly marginal behavior to drive a new election in a case where the employees appear to have spoken somewhat emphatically. And, I mean, where does this go? Suppose that we have an election result that's 150 to 25 and you find an 8A violation. Then does that – I can see remedial obligations extending to posting and all the rest, but the remedial obligation of a new election based on this super thrift test seems to me to indicate that no matter how lopsided the vote and no matter how marginal the violation, we're going to have a new election. You know, I've been concerned about that for some time. And what's your response to this problem? Yes, Your Honor. If it had been close, if it had even been within 10, 15 votes. Well, I think there are multiple – it's a multi-part response that I have. First, the representation case proceeding in this case, as the order makes clear, was severed and remanded. So that part of the board's order is not before this court. It's not a final reviewable order at this stage. Now, of course, if there was a new election conducted and the union won, that could come back before this court. But it's part of the board's remedial order that we're reviewing, isn't it, the order of the new election? That's not a part of the order because it was severed. That is before this court's review right now. Under Section 9C of the statute, the board retains authority to resume processing a representation case consistent with the board's ruling on the U.S. case. You're not ordering a new election at this point? No, we're ordering a new election. Why isn't that before us? The part before the court right now is the board's findings as to the unfair labor practices, which it found interfered with the election to the extent that it directed, remanded to the region in order to direct the second election. But that would have to be consistent under Section 9C with the court's ruling on the board's unfair labor practice findings in this case. Well, that doesn't seem to me to sever them, doesn't seem to me to be a very efficient way of proceeding in these cases. Why don't we get the entire board order together with the remedial aspects of it before us? Well, the court does have before it, importantly, the unfair labor practice findings made by the board here, which affect its decision, if I can finish this line. Yes, please. Which affected its decision here to direct the second election. That second election, the board's handling of that and its authority to resume processing that would only be in a manner consistent with whatever the court has decided here based on the unfair labor practices during the critical period. But statutorily, they are- What your answer is telling me is that we're never going to get- Section 8A violations, both the surveillance violation and the removal of the literature from the lunchroom violation. I suppose we agree with you. You're trying to tell me that we don't have the ability to say that, okay, these are violations, but they're still fairly harmless and marginal in character given their severity and given the lopsided nature of the vote. We must have the authority to review that. No, Your Honor, what I'm saying is if the court has the authority to review the unfair labor practice findings and if it were to find that the confiscation or surveillance findings were marginal or de minimis, the board would still have authority under Section 9C to resume processing the representation case, but in doing so, you know, and it has to, in a manner consisting with its ruling, the board at that point would likely not direct the second election if the violations were found to be de minimis. However, we argue here that especially, I believe, as Your Honor might have acknowledged earlier with regard to the confiscation of union literature, the employees were essentially prevented from being able to communicate in the workplace about the- I'm not talking about that at the moment. I am talking about whether this court, and if you don't tell us why you don't think we do, why we don't have authority to review that aspect of the board's remedial order that demands or that directs a new election, because that's what you're doing. Well, it's the board's position that under Section 9D of the statute, that gives the court a general authority over- general authority to review the board's unfair labor practice findings, and as it pertains to the representation case, only insofar as the court decides to enforce, modify, or set aside the unfair labor practice findings, that's the extent at this point that the court can influence the representation case and how it proceeds. However- Where do you get that from, the statute? The statute- Under Section 9D. The Section 9 that you read seemed to me to give us a pretty broad authority over the review of court orders. I haven't run into many situations where we are confined to violations and not allowed to look into remedies. Perhaps I was confusing the court. Under Section 9C, the board retains the authority to resume processing a representation case in a matter consistent with the court's ruling on the unfair labor practice findings. The next subsection of Section 9 doesn't give the court any authority over the representation case, but it does give it the ability to judicially review for a limited purpose, the board's decision, for the limited purpose of enforcing, modifying, or setting aside the board's order. But based on the court's ruling, then, its decision, the board would resume processing the representation case consistent with the court's ruling. That does not mean the election would occur. But this is getting running around. We can deny, if we deny enforcement of the board's order on the grounds that it overextended itself, the ultimate authority we have is to deny enforcement on the grounds that, we think, the remedy was not proportionate to the violation. We review remedies in light of their proportionality to violations all the time. And if we were, I'm not saying we would, but if we were to conclude that it's disproportionate, this court has the authority to deny enforcement of the board's order on that basis. Well, I'd like to point out that I do not believe that that argument was ever raised to the court in our briefs. But, yes, while the court does have the authority, of course, to review remedies for disproportionality, the portion of the order that the court might be concerned with, the severed portion concerning the representation election, is not directly before the court. Now, if the court were going to deny enforcement of the... Yeah, but through this severance device, you're keeping the key aspect of the board's remedial order, trying to keep it from our review. No, respectfully, Your Honor, it would not be,  but if this court were to deny enforcement of the board's findings of the three unfair labor practices in this case, when the board under Section 9C resumes processing the representation case, my guess is that the election wouldn't happen because the basis for finding an interference with employee Section 7 rights would have been denied enforcement by the court. Yes, but there are plenty of examples where you would find a violation and still find the remedy disproportionate. I'm not prepared to discuss particular cases where that might be the case. However, here, because the disproportionality of the remedy, that part of the board's order, was never presented to the court, probably because that portion of the proceeding was severed, I don't think that the court has to reach that issue and that the court can be assured under Section 9C of the Act that the board would resume processing the representation case consistent with the court's ruling in this case. I'm just worried about this whole device of severance concealing or removing from this court what I think is an inherent authority to determine the proportionality of remedy to violation, and that's the concern I have. Well, if I may, I think it's a twofold response. First, if the court were to deny enforcement of the unfair labor practice findings here during the critical period, there would be presumably no basis on which to direct the second election. However, even if the court granted enforcement of the confiscation and surveillance unfair labor practice findings and a new election was directed, that would be because the court would agree with the board that the employer's conduct interfered with employees' exercise of their Section 7 rights. But if there was a new election held and the union won, the employer could always refuse to bargain and thereby create a technical Section 8A5 violation, just challenging the union's ability to represent the employees and doing so by refusing to bargain. And then it would become before the board, the election at that point, and the employer's requirement to bargain with the union if the union won the election. Then it would become an issue before this court at that stage. But a valid election would have had to be held. Have any other courts applied the Super Thrift Markets test and the Long's Drugstore test in reviewing this sort of board order? I am not aware. I can't say that they haven't. I just wasn't prepared to discuss this issue today since it hadn't been briefed to the courts. I apologize for not being able to discuss Super Thrift today. You never know what you're going to find up there. Definitely. Did you have any questions? Okay, thank you, Mr. Blanchard. Thank you. Mr. Laminac. As this court pointed out, this was a lopsided victory, 142 to 97. What we're asking this court to do is to deny enforcement of the board panel majority, in particular their order, and instruct the board to certify the results on the grounds that their order, the panel majority's findings, are not rational and consistent with the act. That is the standard here, and the rational and consistent. You want us to find that there are no unfair labor practices there, right? Absolutely, Your Honor. All right, but that runs up against a substantial evidence standard in the board's undoubted prerogative. Substantial evidence with respect to facts, Your Honor. We're not asking you to reconsider anything with respect to the facts on this 8C violation. This is a standard of is it rational and consistent with the act. It is not the law for 8C to be completely ignored in this type of context. We have the absolute right to pass out flyers. The board has specifically held that we have that right in the Arrowhart case. You make the point that you haven't raised the super thrift and long drugstore's argument, and that you haven't raised the question of the disproportionality of remedy and violation before this court. Your Honor, we've argued all along that this court should deny enforcement of the order, which should result in the board certifying the initial results. Again, this was a lopsided victory, and we did, in fact, argue, and we've argued all along that this court has the authority to do that. That's what we're asking the court to do. I didn't see you develop the argument that the two of us, your opposing counsel and I, were just discussing. We did not develop the argument in the sense that we are asking this court to step into the shoes of the board and say whether or not the results were so lopsided to go one way or the other. It's a matter of law that both of those unfair labor practices don't give rise to the board enforcing its order here, or enforcement of the board's order here. And as Member Miscimarra pointed out in his dissents, it's a virtually impossible standard. That's inherent in what we're requesting is that these unfair labor practices, even if they did occur, could in no way be considered to have affected the results of the election. This case is about the 8C conduct of the employer here. The campaigns frequently involve hand-billing and out-of-the-ordinary situations where employees are picketing or passing out flyers or hand-billing, not that sort of thing. Employers do this all the time. That's what campaigning is about. They hand out literature. They engage in one-on-one discussions. It's all unusual, and it's all out of the ordinary. The board panel majority completely ignored that aspect of 8C. They found that Section 7 rights prevail no matter what. That's not the law, but most specifically, it's not rational and consistent with the Act, which is what this court requires in order for the board's decisions to be enforced. Thank you for your time, Your Honors. If there are no further questions, thank you. We'll come down and recouncil and then go into the last case.
judges: William B. Traxler, Jr., J. Harvie Wilkinson III, Henry F. Floyd